## IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### NORTHERN DIVISION

**U-SAVE AUTO RENTAL OF AMERICA, INC.**               **PLAINTIFF**

**v.**                      **CAUSE NO. 3:13CV127-LG-JMR**

**SANFORD MILLER**                     **DEFENDANT**

---

**SANFORD MILLER**            **COUNTER-CLAIMANT/**
           **THIRD PARTY PLAINTIFF**

**v.**

**U-SAVE AUTO RENTAL OF AMERICA,**
**INC.; FRANCHISE SERVICES OF**
**NORTH AMERICA, INC.; and**         **COUNTER-DEFENDANT/**
**THOMAS P. McDONNELL, III**      **THIRD PARTY DEFENDANTS**

### MEMORANDUM OPINION AND ORDER REGARDING
### THE PARTIES' MOTIONS FOR SUMMARY JUDGMENT

**BEFORE THE COURT** are the Motion for Summary Judgment [188] filed by Thomas P. McDonnell, III, the Motion for Partial Summary Judgment on Counterclaim Alleging Defamation [190] filed by U-Save Auto Rental of America, Inc., the Motion for Partial Summary Judgment [193] filed by Sanford Miller, the Motion for Partial Summary Judgment [195] filed by Franchise Services of North America, Inc., and the Motion to Strike [216] filed by Sanford Miller in this lawsuit that arose out of FSNA and U-Save's decisions to terminate Miller's employment. After reviewing the submissions of the parties and the applicable law, the Court finds: (1) Miller's Motion for Partial Summary Judgment [193] is denied; (2) FSNA's Motion for Partial Summary Judgment [195] is granted; (3) the Motion for Partial Summary Judgment on Counterclaim Alleging Defamation [190] filed by U-Save

Auto Rental of America, Inc., is granted; (4) the Motion for Summary Judgment [188] filed by Thomas P. McDonnell, III, is granted as to Miller's fraud, defamation, conspiracy, punitive damages, and intentional infliction of emotional distress claims, and is denied as to Miller's interference with contractual and business relations claims; and (5) Miller's Motion to Strike is moot.

## BACKGROUND

U-Save filed a Complaint for Declaratory Judgment against its former executive employee Sanford Miller, asking the Court to adjudicate whether U-Save terminated Miller for cause pursuant to an Executive Employment Agreement dated December 5, 2003.  (Compl. at 2, 5, ECF No. 1).  Pursuant to the Agreement, Miller served as Co-Chief Executive Officer and Co-Chairman of U-Save.  (*Id.* at 2). Third party defendant Thomas McDonnell also served as U-Save's Co-CEO and Co-Chair.  (FSNA's Reply, Ex. A at 3, ECF No. 214-1).  Miller served as Co-Chief Executive Officer and Co-Chairman of U-Save's parent company, FSNA, but the parties dispute whether FSNA should be considered a party to Miller's Executive Employment Agreement.  Miller and McDonnell were the sole directors of U-Save. (*Id.* at 4).  FSNA had five directors: Miller, McDonnell, Thomas McNeely, David Forseth, and Michael Linn.  (*Id.*)

In 2012, FSNA was in the process of merging with Advantage Rent-A-Car, a former Hertz company.  The merger was funded in part by Macquarie Capital. Some of the members of FSNA's board of directors have testified that Macquarie refused to go forward with the merger unless Miller was terminated.  (FSNA's

Resp., Ex. E at 38-39, ECF No. 208-5; FSNA's Resp., Ex. H, ECF No. 208-5; Miller's

Resp., Ex. 13 at 140-41, ECF No. 207-13).  Macquarie was particularly concerned

with at least three incidents of misconduct allegedly committed by Miller.  (*See id.*)

FSNA's board voted to terminate Miller's employment as Co-Chief Executive Officer

on December 6, 2012.  FSNA's minutes state:

> Mr. McNeely noted that the directors have come together to consider
> potential personnel changes in support of the current transaction
> before the board, and not for any other reason, with the goal that
> Macquarie proceeds toward the transaction previously contemplated,
> which the board believes to be in the best interest of the shareholders
> of FSNA.
> . . . .
>
> The board having determined that proceeding with the transaction
> continues to be in the best interest of FSNA and its shareholders, and
> that having first given Miller the opportunity to resign, and having
> further determined that the termination of Mr. Miller would assist
> materially in preserving the value of the transaction for FSNA's
> shareholders, the board hereby resolves to remove Mr. Miller from all
> executive offices that he holds in FSNA and its subsidiaries, including
> his positions as Co-Chairman and Co-CEO of FSNA, with immediate
> effect.

(Miller's Mot., Ex. 3, ECF No. 193-3).  FSNA's December 7, 2012, press release

related to the termination stated, "In contemplation of the Acquisition [of

Advantage], the Company's board of directors has decided to streamline the

Company's executive management, effective today . . . .  Mr. Sanford Miller, the

former Co-Chief Executive Officer and Co-Chairman, will not continue in an

executive capacity with the Company but will continue to serve as a director."

(Miller's Mot., Ex. 5, ECF No. 193-5).  Miller voluntarily resigned his position on

the FSNA Board on December 7, 2012.

U-Save terminated Miller on December 7, 2012.   (Miller Resp., Ex. 11, ECF No. 207-11).  U-Save's minutes give no explanation for Miller's termination.  (*See* id.)

On December 18, 2012, an attorney representing Miller contacted FSNA, suggesting that the parties attempt to resolve any disputes related to Miller's termination.  (U-Save's Resp., Ex. I to Ex. 3, pp. 34-39, ECF No. 204-3).  The attorney proposed that Miller's salary should be paid while the parties negotiated.  (*Id.*)  As a result, U-Save continued to pay Miller's salary, and it considered Miller an at-will employee during this time.  (U-Save's Resp., Ex. 3 at p. 5, ECF No. 204-3).

FSNA and U-Save claim that Miller tried to interfere with FSNA's merger with Advantage after he was terminated.  (U-Save Resp., Ex. 6 at 81-82, ECF No. 204-6).  As a result, the parties' settlement negotiations ceased, and on February 28, 2013,  FSNA's board met again to discuss Miller's termination.   (Miller's Mot., Ex. 12, ECF No. 12).  The minutes of that meeting state:

> Mr. McDonnell called upon Mr. Turner to present Mr. Miller's current status to the board and to request their resolution of Mr. Miller's termination.  Discussion ensued, with Mr. Turner outlining the options.
> . . . .
>
> Mr. Forseth moved to terminate Mr. Miller finally and to file a declaratory judgment action in Mississippi, and Mr. McDonnell seconded.  Mr Forseth voted in favor, as did Mr. McDonnell.  Mr. Linn voted no.  Mr. McNeely voted in favor of the motion.

(*Id.*)  The FSNA board also voted to file a declaratory judgment action

-4-

against Miller.  (*Id.*)

On March 1, 2013, U-Save sent a letter to Miller stating that Miller was terminated effective December 7, 2012, as to his position as Co-Chief Executive Officer and Co-Chairman and effective immediately as to the at-will employment status Miller acquired during settlement negotiations.  (Miller's Mot., Ex. 13, ECF No. 193-13).  The letter also stated that the termination was "for cause based on transgressions falling within the scope of the dishonesty clause of the Executive Employment Agreement (as amended)."  (*Id.*)  FSNA's Notice of Annual Meeting of Shareholders and Information Circular dated March 1, 2013, provided, "On December 6, 2012, FSNA's board of directors decided to streamline the Corporation's executive management . . . and resolved to remove Sanford Miller from all of his executive positions with FSNA and its subsidiaries."  (U-Save's Resp., Ex. B to Ex. 3, ECF No. 204-3).

On March 1, 2013, U-Save filed this lawsuit, seeking a judgment declaring:

> a.  Miller was terminated from his positions as Co-Chief Executive Officer and Co-Chairman of U-Save for cause effective 7 December 2012.
> b.  Miller's termination was not a "qualifying termination."
> c.  U-Save has no contractual duty to pay Miller any severance pay or benefits.
> d.  The Agreement has been terminated and no longer has any force or effect.
> e.  U-Save is entitled to an award of contractual attorney's fees, litigation expenses, and costs.

(*Id.* at 5).  In its Complaint, U-Save stated that it terminated Miller for the following reasons:

a.  Miller opened a bank account at a bank of which he was an officer in violation of corporate by-laws, deposited a check made payable to FSNA in that bank account, and disbursed funds to himself from the bank account.

b.  Miller assigned an inflated value to property that he owned and was attempting to sell to an affiliate of an entity involved in an acquisition transaction with FSNA, with that affiliate to be merged with FSNA as part of the transaction.  Miller also falsely represented that an alternative property under consideration by the buyer was subject to a restriction that would not allow the property to be used for the purposes intended by the buyer.

c.  Miller, as a shareholder of a U-Save franchisee, used his influence as an officer of U-Save to forestall collection activities against the franchisee after the franchisee defaulted on its obligations.  Previously, Miller used his influence as a U-Save officer to preclude his signing a personal guarantee for the performance of the franchisee's obligations, a material deviation from the standard requirement that shareholders of a franchisee be guarantors.

(Complaint at 4, ECF No. 1).

Miller filed a counterclaim against U-Save and a third party complaint against FSNA and his former co-CEO, Thomas McDonnell.  (Miller Ans., ECF No. 9).  Miller seeks a declaratory judgment against U-Save and FSNA that his termination from both entities constituted a qualifying termination, and thus he is entitled to severance payment and other benefits.  (*Id.* at 30).  Miller has also filed breach of contract, breach of the covenant of good faith and fair dealing, intentional infliction of emotional distress, and defamation claims against U-Save and FSNA.  (*Id.* at 30-35).  The claims filed against McDonnell are: interference with contractual and prospective business relations, fraud, conspiracy to commit fraud, defamation, and intentional infliction of emotional distress.  (*Id.*)  All of the parties

have filed Motions for Summary Judgment.

## DISCUSSION

A motion for summary judgment may be filed by any party asserting that there is no genuine issue of material fact and that the movant is entitled to prevail as a matter of law on any claim.  Fed. R. Civ. P. 56.  The movant bears the initial burden of identifying those portions of the pleadings and discovery on file, together with any affidavits, which it believes demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  Once the movant carries its burden, the burden shifts to the non-movant to show that summary judgment should not be granted.  *Celotex Corp.*, 477 U.S. at 324-25.  The non-movant may not rest upon mere allegations or denials in its pleadings but must set forth specific facts showing the existence of a genuine issue for trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-57 (1986).

## I.  Miller's Motion for Partial Summary Judgment [193]

Miller seeks partial summary judgment as to U-Save and FSNA's liability for breach of contract as well as Miller's claim for declaratory judgment.  Miller argues that U-Save and FSNA did not terminate him for cause and, thus, they breached the Agreement by denying him severance and other benefits.

First, Miller asserts that the reasons that U-Save and FSNA proffer for his termination do not constitute "cause" under the Agreement.  The Agreement defines "cause" as:

(i) an act or acts of dishonesty by MILLER in connection with

> MILLER's employment, (ii) any conduct with or against another
> employee, customer or other person, including conduct involving moral
> turpitude, which causes or is likely to cause U-SAVE's embarrassment,
> liability or damage or (iii) MILLER's repeated failure to perform
> MILLER's duties or to perform in accordance with directions received
> from U-SAVE's Board of Directors.

(Compl., Ex. 1 at 3, ECF No. 1-1).  In correspondence U-Save sent Miller on March 1, 2013, it classified Miller's conduct as dishonesty warranting termination for cause.  (Miller's Mot., Ex. 13, ECF No. 193-13).

The first alleged incident of dishonesty was the opening of a Gateway Bank account in FSNA's name.  When Miller opened the account, he signed a Corporate Authorization Resolution.  (Miller's Mot., Ex. 16, ECF No. 193-16).  He listed his office address in Daytona Beach, Florida, as FSNA's address.  (*See id.*)  The Resolution signed by Miller on February 3, 2013, provides, "[T]he resolutions on this document are a correct copy of the resolutions adopted at a meeting of the Board of Directors of the Corporation duly and properly called and held on _____ (date).  These resolutions appear in the minutes of this meeting and have not been rescinded or modified."  (*Id.*).[1]  The Resolution provided that only one signature – Miller's – was required on the account.  (*Id.*)

Miller argues that FSNA authorized him to open the account in a FSNA board of directors teleconference held on February 2, 2012.  The minutes for that teleconference state, "Mr. Miller is going to negotiate the church [sic] through his

---

[1] The Court notes that the date of the board meeting was left blank on the Resolution.

bank and reissue a check to FSNA to cut down on the ten day clearance time."
(Miller's Mot., Ex. 15, ECF No. 193-15).  Miller also claims that FSNA's officers
were aware of the account, because Ashley Chambliss, FSNA's Interim Chief
Financial Officer, sent an email to Miller, requesting information related to the
account on March 20, 2012.  (Miller's Mot., Ex. 19, ECF No. 193-19).

On January 23, 2013, Ernst & Young issued FSNA's 2012 audit.  (Miller's
Mot., Ex. 23, ECF No. 193-23).  Ernst & Young labeled the opening of the Gateway
account a "significant deficiency" stating, "The normal process for setting up a bank
account was not followed which resulted in only one signing authority on the
account (one Co-CEO).  This represents a weakness in internal controls."  (*Id.*)
Although Ernst & Young noted that all monies deposited in the account had been
accounted for, McDonnell claims that this deficiency in the audit had an "adverse
impact" on FSNA's merger with Advantage Rent A Car.  (*Id.*; U-Save Resp., Ex. 3 at
3 (¶14), ECF No. 204-3).

McDonnell has testified by declaration that the FSNA board of directors
"never resolved to authorize Miller to open a checking account for FSNA at the
Gateway Bank . . . ."  (U-Save Resp., Ex. 3 at 3 (¶14), ECF No. 204-3).  McDonnell
also testified that the Daytona, Florida, address Miller listed for FSNA on the
Resolution was not FSNA's business address. (U-Save Resp., Ex. 3 at 3 (¶14), ECF
No. 204-3).

The second alleged incident of dishonesty was described by McDonnell in a
declaration:

> Mr. Miller assigned an inflated value to a property called Narcoossee Place, a property in which Mr. Miller had an ownership interest and which he wanted to sell or lease to an affiliate of Macquarie Capital, FSNA's investment banking partner in the Advantage Rent-A-Car acquisition.  Mr. Miller also misrepresented the unavailability of a property immediately next to Narcoossee Place owned by Enterprise Holdings, Inc. claiming that the adjacent property has a legal or deed restriction which would prevent it from being used as a location for a car rental business.

(U-Save's Resp., Ex. 5 at 2, ECF No. 204-5).  William Fainberg, a manager of Enterprise Holdings, Inc., has testified that he told Miller that Enterprise would not allow its property to be used as a rental car facility.  (Miller's Mot., Ex. 27, ECF No. 193-27).  However, U-Save and FSNA argue that there was no such restriction on the property's use, because the property was later purchased for use as a car rental business.  (U-Save's Resp., Ex. E at 54-55, ECF No. 208-5).

The third alleged incident of dishonesty relates to Miller's financial interest in a U-Save franchisee, RAC Enterprises.  It is undisputed that Miller refused to sign a personal guarantee for the performance of the franchise's operations.  (U-Save Mot., Ex. 7 at 107-08, ECF No. 204-7).  U-Save also claims that Miller attempted to prevent U-Save from collecting on a large debt that RAC owed to U-Save after RAC defaulted on its financial obligations.  It has produced evidence indicating that Miller assured U-Save on more than one occasion that RAC's debt would be taken care of, but the debt was never paid.  (U-Save's Resp., Ex. A, X to Ex. B, ECF No. 208-2).  Miller explained that he took a hands-off position, because he wanted to avoid a conflict of interest.  (U-Save Resp., Ex. 7 at 55-56, 121, ECF No. 204-7).  U-Save has also presented emails indicating that Miller opposed U-

Save's attempts to cancel RAC's insurance coverage and threatened to seek termination of FSNA's Chief Financial Officer because he did not comply with Miller's demands to continue coverage.  (U-Save's Resp., Ex. F-H to Ex. B, ECF No. 208-2).  Miller asserts that it was in FSNA's best interest to keep RAC's Orlando franchise running until the Advantage Rent-A-Car deal was completed, due to Orlando's high volume car rental market. (U-Save's Resp., Ex. 7 at 131, 143-44).

A reasonable jury could determine that the FSNA board never adopted resolutions authorizing Miller to open a Gateway Bank account in FSNA's name. In addition, a jury could find that Miller made misrepresentations in the paperwork that he signed when he opened the account.  There is also evidence before the Court that indicates that Miller may have improperly placed his own interests before those of FSNA and/or U-Save with regard to his RAC and Narcoossee Place investments.  As a result, the Court finds that a genuine issue of material fact exists regarding whether Miller engaged in dishonest conduct warranting termination for cause.

In the alternative, Miller argues that U-Save and FSNA waived their right to terminate Miller for cause by initially electing to terminate him without cause.  U-Save and FSNA have presented evidence that Miller's alleged misconduct threatened FSNA's merger with Advantage Rent-A-Car.  (*See* FSNA's Resp., Ex. E at 38-39, 92, ECF No. 208-5; FSNA's Resp., Ex. H, ECF No. 208-8; Miller's Resp., Ex. 13 at 140-41, ECF No. 207-13).  They have also submitted evidence that Miller was terminated on that basis.  (*See id.*)  As a result, there is evidence that Miller

may have been terminated for cause in December 2012.  It would be inappropriate for the Court to weigh the parties' credibility or the evidence presented at this stage of the litigation.  The issue of whether U-Save and/or FSNA terminated Miller for cause in December 2012 must be decided by a jury.  Thus, the Court finds that Miller's Motion for Partial Summary Judgment must be denied.

## II.  FSNA's Motion for Partial Summary Judgment [195]

FSNA argues that Miller's claims for breach of contract and breach of the covenant of good faith and fair dealing should be dismissed, because FSNA was not a party to Miller's Executive Employment Agreement.  Miller counters that: (1) FSNA assumed U-Save's obligations during a 2006 merger; (2) both FSNA and U-Save are parties to the Agreement pursuant to a 2010 amendment; and (3) the corporate veil should be pierced so that FSNA is held liable for U-Save's alleged breaches of the Agreement.

The plaintiff/counter-defendant U-Save is a wholly owned subsidiary of U-Save Holdings, Inc., and U-Save Holdings is a wholly owned subsidiary of FSNA. (U-Save's Resp., Ex. 3 at 1, ECF No. 204-3).  Both U-Save and U-Save Holdings are Mississippi corporations.  (*Id.*)  At the time when the events at issue in this lawsuit occurred, FSNA was a Canadian corporation, but it is now a Delaware corporation. (U-Save's Resp., Ex. 5 at 1, ECF No. 204-5).  FSNA's stock is publicly traded on the TSXV stock exchange in Canada.  (*Id.*)

McDonnell has testified by declaration that FSNA, U-Save Holdings, and the plaintiff/counter-defendant U-Save are separate and distinct legal entities.  (FSNA's

Reply, Ex. A at 1, ECF No. 214-1).  He also testified:

> 16.  [In 2006], Miller and [McDonnell] together owned 100 percent of the shares of U-Save Holdings.  Miller and [McDonnell] transferred all of [their] shares in U-Save Holdings to FSNA in exchange for shares in FSNA.  Thus, in 2006, FSNA became the sole shareholder of U-Save Holdings.  U-Save Holdings was not merged into FSNA or any other entity, and to this day it remains a Mississippi corporation in good standing.
>
> 17.  The transaction between FSNA and U-Save Holdings constituted a "reverse take-over" because the former shareholders of U-Save Holdings (Miller and [McDonnell]) owned more shares in FSNA than the pre-existing shareholders of FSNA after the transaction was completed.
>
> 18.  At the time FSNA acquired sole ownership of U-Save Holdings, U-Save Holdings owned more than 85% of the shares of U-Save Auto Rental.  The remaining shares of U-Save Auto Rental were owned by several third-party investors.  Those investors transferred all of their shares in U-Save Auto Rental to U-Save Holdings in exchange for FSNA stock.  Thus, in 2006, U-Save Holdings became the sole shareholder of U-Save Auto Rental.  U-Save Auto Rental was not merged into U-Save Holdings, FSNA, or into any other entity.  U-Save Auto Rental to this day remains a Mississippi corporation in good standing.

(*Id.* at 3-4).

In a declaration, Miller has testified that the 2006 transaction was a reverse merger.  (Miller's Resp., Ex. 12 at 2, ECF No. 207-12).  He also claimed that his Executive Employment Agreement was amended in 2010 due to increased administrative and overhead expenses that he incurred due to FSNA's merger with Advantage Rent-A-Car.  (*Id.*)  He stated:

> I considered the amendment of my executive employment agreement as an obligation owed by both FSNA and U-Save . . . .  Practically, we ran FSNA and U-Save as one in the same.  We had the same executive employees, utilized the U-Save bank account for FSNA expenses, and nearly all employees exclusively communicated on U-Save's e-mail system.  Indeed, FSNA did not even have its own bank account until

2012.  While working at the Company, even though McDonnell and I
were the sole board members of U-Save, the U-Save board of directors
never held a single meeting.

(*Id.*)

McDonnell counters that Miller never asked FSNA to be a party to the

Executive Employment Agreement, and Miller's salary was always paid by U-Save.

(FSNA Reply, Ex. A at 2, ECF No. 214-1).  He also contends that FSNA opened

bank accounts in Canada in 1998 and 2006, and Miller was a signatory on those

accounts.  (*Id.* at 6).  Prior to Miller's termination, FSNA had five directors, while

U-Save had two directors.  (*Id.* at 4).  U-Save has been adequately capitalized from

2003 to the present, and it has not received financing from FSNA or U-Save

Holdings.  (*Id.* at 5).

Miller's Executive Employment Agreement provides, "Whereas, U-Save Auto

Rental of America, Inc., a Mississippi corporation (hereafter U-Save) has agreed to

employ Sanford Miller (hereafter Miller) as an executive upon the terms and

covenants hereafter set forth . . . ."  (FSNA's Mot., Ex. 1, ECF No. 195-2).  It was

signed on December 5, 2003, by McDonnell on behalf of U-Save and by Miller.  (*Id.*)

The Amendment to Executive Employment Agreement states, "This Amendment to

Executive Employment Agreement (this "Amendment") is entered into as of

January 28, 2010, by and between Sanford Miller ("Mr. Miller") and U-Save Auto

Rental of America. Inc., a Mississippi corporation ("U-Save").  (FSNA's Mot., Ex. 2,

ECF No. 195-3).  It was signed by Robert M. Barton, President of U-Save, and

Miller.  (*Id.*)

First, there is no evidence to support Miller's contention that FSNA assumed U-Save's obligations or liabilities during the 2006 transaction.  Contrary to Miller's assertions,  U-Save survived the transaction, and it remains a separate, independent Mississippi corporation in good standing.  *See* Miss. Code Ann. § 79-4-11.07 (a)(2) ("When a merger becomes effective . . . [t]he separate existence of every corporation or eligible entity that is merged into the survivor ceases . . . ."); *see also Paradise Corp. v. Amerihost Dev., Inc.*, 848 So. 2d 177, 179 (¶9) & 180 (¶12) (Miss. 2003) (discussing the doctrines of de facto merger and mere continuation).  Since the two companies did not merge into one company, FSNA did not assume U-Save's liabilities.

Second, FSNA was not a party to either the Executive Employment Agreement or the Amendment.  When interpreting a contract, a court must first look to the four corners of the contract itself and give effect to all of its clauses. *Facilities, Inc. v. Rogers-Usry Chevrolet, Inc.*, 908 So. 2d 107, 111 (¶10) (Miss. 2005). The court's concern is "not nearly so much with what the parties may have intended, but with what they said, since the words employed are by far the best resource for ascertaining the intent and assigning meaning with fairness and accuracy."  *Id.*  Therefore, it would be improper for a court "to infer intent contrary to that emanating from the text at issue."  *Id.*  The court can only look beyond the contract's language if it determines that the contract is ambiguous.  *Id.*

By asking the Court to find that FSNA became a party to the Agreement pursuant to the Amendment, he is asking the Court to infer intent contrary to that emanating from the text of the contracts.  Neither the Agreement nor the Amendment stated that FSNA was assuming any liability or obligation, and FSNA was not listed as a party to either the Agreement or the Amendment.  The Court cannot hold FSNA liable pursuant to contracts that it did not sign or agree to.

Finally, Miller asks the Court to pierce the corporate veil.  It should be noted that Miller did not plead any facts supporting a claim for piercing the corporate veil in his Complaint.  Nevertheless, out of an abundance of caution, the Court will address whether the corporate veil should be pierced in this case.

> Mississippi case law generally favors maintaining corporate entities and avoiding attempts to pierce the corporate veil.  *Gray* [*v. Edgewater Landing Inc.*], 541 So. 2d [1044,] 1047 [(Miss. 1989)].  "[T]he cardinal rule of corporate law is that a corporation possesses a legal existence separate and apart from that of its officers and shareholders."  *Id.* at 1047 . . .; *see also [N. Am.] Plastics Inc. v. Inland Shoe [Mfg.] Co.*, 593 F. Supp. 875, 877 (N.D. Miss. 1984).  This rule applies "whether such shareholders are individuals or corporations."  *[N. Am.] Plastics*, 592 F. Supp. at 877.

*Buchanan v. Ameristar Casino Vicksburg Inc.*, 957 So. 2d 969, 977 (¶27) (Miss. 2007).  "The general rule of law basic to the concept of the corporation is that the distinct corporate identity will be maintained unless to do so would subvert the ends of justice."  *Johnson & Higgins of Miss. Inc. v. Comm'r of Ins. of Miss.*, 321 So. 2d 281, 284 (Miss. 1975).

> [F]or a court to disregard the corporate entity and expose shareholders to liability, the complaining party must show: (a) some frustration of contractual expectations regarding the party to whom he looked for

> performance; (b) the flagrant disregard of corporate formalities by the
> defendant corporation and its principals; [and] (c) a demonstration of
> fraud or other equivalent misfeasance on the part of the corporate
> shareholder.

*Restaurant of Hattiesburg, LLC v. Hotel & Restaurant Supply, Inc.*, 84 So. 3d 32, 38

(¶20) (Miss. Ct. App. 2012) (quoting *Gray v. Edgewater Landing Inc.*, 541 So. 2d

1044, 1047 (Miss. 1989)). "To present a jury issue on a demand that the corporate

veil be pierced a party must present some credible evidence on each of these points."

*Gray*, 541 So. 2d at 1047.

The first element hinges on whether Miller knew that he entered into a

contract with U-Save, not FSNA. *See Rosson v. McFarland*, 962 So. 2d 1279, 1285

(¶¶ 24-28) (Miss. 2007); *see also Restaurant of Hattiesburg*, 84 So. 3d at 40 (¶25).

The Mississippi Supreme Court has held that "where parties to a transaction finally

reduce its terms to an executed writing, all negotiations and previous

understandings are merged into the writings and the terms of the writing will

control." *Id.* at 1285 (¶26).

> The attempt to hold another party liable where the claim asserted is of
> contractual origins presents difficulties. The question which must be
> met and answered is why one who contracted with a selected party and
> received the promise he bargained for should be allowed to look to
> another merely because he is disappointed in the selected party's
> performance. The answer under contract law is that he may not hold
> the other liable without additional compelling facts.

*Id.* at 1286 (¶27) (quoting *Gray*, 541 So. 2d at 1047).

The record before the Court demonstrates that Miller was a sophisticated and

experienced business man. There is no indication that he ever asked FSNA to

-17-

assume obligations under his Executive Employment Agreement, as amended.  In fact, Miller's own attorney drafted the Amendment and chose to only list U-Save as a party.  (See FSNA's Reply, Ex. A at 2, ECF No. 214-1).  As a result, Miller cannot demonstrate frustration of contractual expectations.

As for the second factor, the record before the Court does indicate that FSNA and U-Save have at times disregarded their corporate formalities.  For example FSNA voted to approve the filing of a declaratory judgment action concerning Miller's termination, but it never did so.  Only U-Save filed this action, and FSNA was merely joined as a third-party defendant.  There is no evidence that U-Save ever approved the filing of this lawsuit.  Furthermore, a promissory note produced by Miller appears to reference FSNA as being formerly known as U-Save.  (Miller's Resp., Ex. 9, ECF No. 207-9).  Miller has also produced a statement signed by McDonnell on FSNA letterhead that forgives a $50,000 loan purportedly owed to U-Save.  (Miller's Resp., Ex. 10, ECF No. 207-10).[2]  Nevertheless, these incidents are insufficient to justify piercing the corporate veil.  *See Gray*, 541 So. 2d at 1047 (explaining that "the corporate fiction will not be disregarded in cases of simple negligence").

Finally, Miller has not demonstrated that FSNA committed fraud or misfeasance.  He merely argues, "FSNA's attempt to avoid liability under the Executive Employment Agreement would result in a fraud or equivalent

---

[2] Other correspondence signed by FSNA's Chief Financial Officer states that the loan was owed to FSNA. (Miller's Resp., Ex. 10, ECF No. 207-10).

misfeasance upon Miller." (Miller Resp. at 13, ECF No. 207). Since Miller has not presented credible evidence as to each of the three required elements for piercing the corporate veil, he has not demonstrated the existence of a question of fact for the jury.

FSNA has demonstrated that it was not a party to the Executive Employment Agreement, as amended, and it is not otherwise liable for the liabilities and obligations of U-Save. As a result, FSNA is entitled to partial summary judgment as to Miller's breach of contract and breach of the covenant of bad faith and fair dealing claims.

### III. Motions for Summary Judgment Regarding Miller's Defamation Claims [188, 190]

U-Save and McDonnell seek summary judgment as to Miller's defamation claim. In his counterclaim and third party complaint, Miller alleges that the following conduct constituted defamation:

> 137. The statements made by U-Save in the Termination Letter and elsewhere, and the statements made by FSNA in the AGM Circular, the Special Meeting Circular and other public filings to the effect that Miller was terminated for "cause" were untrue, were known to be untrue, and were made and published with malice and the intent to damage Miller.
> 138. The statements made by McDonnell at the FSNA general meeting to the effect that Miller was terminated for "self-dealing" were untrue, were known to be untrue, and were made and published with malice and the intent to damage Miller.
> 139. The statements made by McDonnell at the December 6, 2012 FSNA Board meeting to the effect that Hertz knew and the FTC knew of and approved the termination of Miller from his executive positions were untrue, were known to be untrue, and were made and published with malice and intent to damage Miller.

(Counterclaim at 34, ECF No. 9).

In order to state a claim for defamation, a plaintiff must demonstrate each of the following elements: "(a) a false statement that has the capacity to injure the plaintiff's reputation; (b) an unprivileged publication, i.e., communication to a third party; (c) negligence or greater fault on [the] part of [the] publisher; and (d) either actionability of [the] statement irrespective of special harm or [the] existence of special harm caused by publication." *Jones v. Mullen*, 100 So. 3d 490, 494 (¶12) (Miss. Ct. App. 2012) (quoting *Speed v. Scott*, 787 So. 2d 626, 631 (¶21) (Miss. 2001)). A defamatory statement is "any written or printed language which tends to injure one's reputation, and thereby expose him to public hatred, contempt or ridicule, degrade him in society, lessen him in public esteem or lower him in the confidence of the community." *Journal Pub. Co. v. McCullough*, 743 So. 2d 352, 360 (¶24) (Miss. 1999).

McDonnell's alleged statements that Hertz and the Federal Trade Commission (FTC) knew of and approved the decision to terminate Miller are not defamatory. Regardless of whether the alleged statement was untrue, the statement clearly cannot be considered defamation since it would not affect Miller's reputation in the community. *See McCullough*, 743 So. 2d at 360 (¶24).

The other alleged statements concern the alleged grounds for Miller's termination. As explained previously, the circumstances and grounds for Miller's termination are disputed by the parties. Nevertheless, McDonnell and U-Save claim that the alleged statements are subject to a qualified privilege. "[T]he law

-20-

guards jealously the right to the enjoyment of a good reputation, but public policy, . . . the interests of society, and sound business demand that an employer . . . be permitted to discuss freely with an employee, or his chosen representative, charges made against the employee affecting the latter's employment." *Brothers v. Winstead*, 129 So. 3d 906, 929 (¶78) (Miss. 2014) (quoting *Killebrew v. Jackson City Lines*, 82 So. 2d 648, 650 (1955)).   When a qualified privilege exists, defamatory statements are not actionable "absent bad faith or malice if the communications are limited to those persons who have a legitimate and direct interest in the subject matter." *Id.*

The only argument raised in opposition to U-Save and McDonnell's claim of privilege is Miller's argument that U-Save and McDonnell acted with malice.  The Mississippi Court of Appeals has explained that a plaintiff must first present evidence of actual malice that creates a genuine issue of material fact before the case can be submitted to a jury.  *Jones*, 100 So. 3d at 496 (¶22).

Miller claims that McDonnell "had ample personal reasons to defame Miller," and that McDonnell benefitted personally from Miller's termination.  (Miller Resp. at 31, ECF No. 207).  The fact that McDonnell may have benefitted from Miller's termination is not evidence of malice.  Miller also relies on speculative statements made by Michael Linn, a former member of FSNA's board.  (Miller Resp., Ex. 13 at 202-03, ECF No. 207-13).  Linn's testimony that he thinks McDonnell may have had ill will toward Miller is not admissible. *See Vance v. N. Panola Sch. Dist.*, No. 98-

60719, 189 F.3d 470, *2 (5th Cir. July 16, 1999) ("While it is true that the evidence need not be presented in a form admissible at trial, this court does not allow the admission of pure hearsay or speculation as evidence to avoid summary judgment.") As a result, Miller has not demonstrated the existence of a genuine issue of material fact for the jury as to his defamation claims filed against McDonnell and U-Save.[3]   Therefore, U-Save and McDonnell are entitled to summary judgment as to Miller's defamation claims.

## IV.  McDonnell's Motion for Summary Judgment [188]

In addition to the defamation claim discussed supra, Miller has filed the following claims against McDonnell: (1) interference with contractual and prospective business relations and aiding and abetting interference with contractual and prospective business relations; (2) fraud; (3) conspiracy to commit fraud; and (4) intentional infliction of emotional distress.  Miller does not dispute that McDonnell is entitled to summary judgment as to Miller's fraud claim. (Miller's Resp. at 2 n.1, ECF No. 207).

### A.  Interference with Contractual and Prospective Business Relations

The Mississippi Court of Appeals has held:

In order to prove tortious interference with contractual relations, the plaintiff[] must show the following elements: (1) the acts were intentional and willful; (2) that they were calculated to cause damages

---

[3] The Court has searched the record and has not located a request on the part of FSNA, either through motion or joinder, for summary judgment as to Miller's defamation claim.

to the plaintiffs in their lawful business; (3) that they were done with the unlawful purpose of causing damage and loss, **without right or justifiable cause** on the part of the defendant; and (4) that actual loss occurred.

*Jones v. Mullen*, 100 So. 3d 490, 498 (¶35) (Miss. Ct. App. 2012) (emphasis added).[4]

"This tort 'is based on intermeddling – a tort occurs if without sufficient reason, one person intentionally interferes with another's contract even if the interference is by giving information that is completely accurate, when the purpose was to cause interference and injury results.'" *Id.* (quoting *Morrison v. Miss. Enter. for Tech.*, 798 So. 2d 567, 575 (¶28) (Miss. Ct. App. 2001).

Miller argues that McDonnell improperly participated in FSNA's February 28, 2013, board meeting, despite McDonnell's admission at a prior board meeting that he had a conflict of interest as to the issues concerning Miller's employment. Miller claims that the February 28th board meeting was the first occasion on which the board decided to terminate Miller for cause, but FSNA and U-Save dispute that assertion.

The Court finds that genuine issues of material fact exist regarding whether McDonnell acted with justifiable cause. If McDonnell had a conflict of interest, a jury could find that McDonnell did not have a right to participate in the February

---

[4] The parties have only addressed interference with contractual relations in their pleadings related to McDonnell's Motion; thus, it is not necessary for the Court to address interference with business relations here. It should be noted that Miller did not enter into a contract with FSNA; he only contracted with U-Save. However, a jury could find that some of the actions related to FSNA impacted the decisions and actions of U-Save.

28, 2013, board meeting.  A jury should decide whether the conflict still existed at the time when that meeting occurred.  Furthermore, a jury should evaluate the importance of that meeting given the earlier decision to terminate Miller, as well as the impact of McDonnell's actions at that meeting.  Therefore, McDonnell is not entitled to summary judgment as to Miller's tortious interference with contractual and business relations claims.

### B. Conspiracy to Commit Fraud

Miller asserted separate claims of fraud and conspiracy to commit fraud against McDonnell in his third-party complaint, but Miller has conceded that McDonnell is entitled to summary judgment as to the fraud claim.  In his response in opposition to McDonnell's Motion for Summary Judgment, Miller reclassifies his conspiracy claim, alleging that McDonnell conspired with Macquarie Capital to have Miller terminated, so that Macquarie and McDonnell could take control of FSNA and U-Save.

In order to state a conspiracy claim, a plaintiff must demonstrate that two or more persons or corporations "had an agreement, either to accomplish an unlawful purpose or to accomplish a lawful purpose unlawfully." *Gallegos v. Mid-South Mortgage & Inv., Inc.*, 956 So. 2d 1055, 1060 (¶22) (Miss. Ct. App. 2007).  There is no admissible evidence before the Court that McDonnell and either Macquarie or its employees had such an agreement.  Therefore, McDonnell is entitled to summary judgment as to Miller's conspiracy claim.

-24-

## C.  Intentional Infliction of Emotional Distress

Finally, Miller attempts to assert a claim for intentional infliction of emotional distress.

> Intentional infliction of emotional distress results when the actions of the defendant were "wanton and willful and evoked outrage or revulsion." *Riley v. F.A. Richard & Assocs., Inc.*, 16 So. 3d 708, 719 (¶33) (Miss. Ct. App. 2009).  "The severity of the acts must be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Id.* (quoting *Speed v. Scott*, 787 So. 2d 626, 630 (¶18) (Miss. 2001)).

*Lambert v. Baptist Mem'l Hosp. N.-Miss., Inc.*, 67 So. 3d 799, 805 (¶25) (Miss. Ct. App. 2011).  Since Miller has not presented evidence that meets the strenuous standards required for demonstrating intentional infliction of emotional distress, McDonnell is entitled to summary judgment.

## D.  Punitive Damages

Miss. Code Ann. § 11-1-65(1)(a) provides:

> Punitive damages may not be awarded if the claimant does not prove by clear and convincing evidence that the defendant against whom punitive damages are sought acted with actual malice, gross negligence which evidences a willful, wanton or reckless disregard for the safety of others, or committed actual fraud.

Miller has conceded he cannot demonstrate that McDonnell committed an actual fraud.  Furthermore, as explained previously, he cannot demonstrate actual malice on the part of McDonnell.  Finally, there is no evidence that McDonnell engaged in willful, wanton, or reckless conduct.  As a result, McDonnell is entitled to summary judgment as to Miller's request for punitive damages.

**V.  Miller's Motion to Strike [216]**

The exhibits that are the subject of Miller's Motion to Strike have not had any effect on the Court's ruling.  Therefore, the Motion to Strike is moot.

## CONCLUSION

For the foregoing reasons, Miller's Motion for Partial Summary Judgment is denied.  The Motions for Partial Summary Judgment filed by FSNA and U-Save are granted.  McDonnell's Motion for Summary Judgment is granted in part and denied in part.  Miller's Motion to Strike is moot.

**IT IS, THEREFORE, ORDERED AND ADJUDGED** that the Motion for Partial Summary Judgment [193] filed by Sanford Miller is **DENIED**.

**IT IS, FURTHER, ORDERED AND ADJUDGED** that the Motion for Partial Summary Judgment [195] filed by Franchise Services of North America, Inc., is **GRANTED**.  Sanford Miller's breach of contract and breach of the duty of good faith and fair dealing claims are hereby **DISMISSED WITH PREJUDICE** as to FSNA.

**IT IS, FURTHER, ORDERED AND ADJUDGED** that the Motion for Partial Summary Judgment on Counterclaim Alleging Defamation [190] filed by U-Save Auto Rental of America, Inc., is **GRANTED**.  Miller's defamation claim is hereby **DISMISSED WITH PREJUDICE** as to U-Save.

**IT IS, FURTHER, ORDERED AND ADJUDGED** that the Motion for Summary Judgment [188] filed by Thomas P. McDonnell, III, is **GRANTED** as to Miller's fraud, defamation, conspiracy, and intentional infliction of emotional

distress claims, and is **DENIED** as to Miller's tortious interference with contractual and business relations claims.  Miller's fraud, defamation, conspiracy, punitive damages, and intentional infliction of emotional distress claims are hereby **DISMISSED WITH PREJUDICE** as to McDonnell.

**IT IS, FURTHER, ORDERED AND ADJUDGED** that the Motion to Strike [216] filed by Sanford Miller is **MOOT**.

**SO ORDERED AND ADJUDGED** this the 22nd day of May, 2014.


s/ *Louis Guirola, Jr.*
LOUIS GUIROLA, JR.
CHIEF U.S. DISTRICT JUDGE